IN RE A.B. ET AL.; SUMMIT COUNTY CHILDREN SERVICES
BOARD, APPELLANT; BROWN ET AL., APPELLEES.

[Cite as *In re A.B.*, 110 Ohio St.3d 230, 2006-Ohio-4359.]

(No. 2005–1966—Submitted May 9, 2006—Decided September 6, 2006.)

**LUNDBERG STRATTON, J.**

{¶ 1} The Ninth Appellate District has certified the following question to us after determining that its decision conflicts with a decision from the Eighth District: "After a child agency is granted temporary custody of a child and files a motion for permanent custody, does a juvenile court have the authority to place the child in a planned permanent living arrangement when the agency does not request this disposition?"

{¶ 2} For the reasons that follow, we answer this question in the negative. Therefore, we reverse the judgment of the court of appeals and remand the cause to the trial court.

## I. Facts and Procedural History of the Case

{¶ 3} Appellee Charles Brown and Rebecca Brown are the parents of appellees A.B. (born November 10, 1992), J.B. (born September 21, 1994), T.B. (born September 29, 1996), and C.B. (born February 17, 1998). In May 2003, the juvenile court granted emergency temporary custody of the children to appellant, Summit County Children Services Board ("CSB"), finding that the children were dependent and neglected, after the CSB had received referrals alleging general and medical neglect, supervisory issues, domestic violence, and parental drug abuse. Both of the parents agreed to waive the time limit for disposition, and both parents agreed that the children would be placed in the temporary custody of CSB.

{¶ 4} On October 18, 2004, CSB filed a motion for permanent custody, indicating that the mother had relinquished her parental rights. Attorney Richard A. Reece Jr. was appointed to represent the children, and on October 25, 2004, he filed a motion for a six-month extension of the order of temporary

custody. On March 2, 2005, attorney Reece filed a motion for a planned permanent living arrangement.

{¶ 5} On March 24, 2005, a hearing was held on both motions. The witnesses testifying were Jerita Williams, the CSB caseworker assigned to this case, Walter Crawford, a chemical-dependency counselor who worked with the father, Kimberly Nelson, the children's guardian ad litem, and the father.

{¶ 6} Williams testified that the goal of the original case plan was reunification of the children with the parents. The case plan required that (1) the parents find and maintain stable housing, (2) the father undergo anger-management counseling, (3) both parents complete a drug and alcohol assessment and follow all recommended treatment, (4) both parents follow up on medical care for their children, and (5) the father become employed.

{¶ 7} Williams stated that the father completed a residential drug treatment program in October 2003. However, between October 2003 and March 2004, CSB did not have contact with him because his whereabouts were unknown. In March 2004, the father contacted CSB to inquire about the status of his case. During the five-month period in which his whereabouts were unknown, he did not visit his children and made no attempt to inquire with the agency about their welfare. When the father reinitiated contact with CSB, he first told CSB that his father was ill and he had to go take care of him, and then he said that he "just had to leave." Finally, the father admitted that he had relapsed.

{¶ 8} Williams testified that in March 2004, she referred the father for outpatient treatment due to his relapse. However, he did not comply. He later enrolled himself in the Salvation Army treatment facility, but did not successfully complete the program because he tested positive for crack cocaine during a random drug screen in June 2004. Once discharged from the Salvation Army program, in August 2004, the father enrolled himself in New Destiny Treatment Center, an inpatient facility, for a nine-month program. At the time of the hearing in March 2005, Williams testified that to her knowledge, the father had been compliant with the treatment program and had not testified positive during that time. In the time leading up to the hearing, the father did not provide any proof of employment, nor did he have stable housing.

{¶ 9} In March 2004, CSB resumed visitation between the father and his children, and he complied with the one-hour-per-week schedule. Between March 2004 and the time of the hearing in May 2005, the father was consistent with his visits, and the children appeared to be happy to see him.

{¶ 10} From 2003 to this time, the Brown children have been in a foster home. The three eldest children have resided together since the onset of the case, and the youngest was relocated there in August 2003 after he entered kindergarten. The caseworker testified at the hearing that the foster home was a good

environment, and the children and the foster mother had bonded. Although the foster mother was unwilling to adopt the children due to her age, she was willing to foster them until they were adopted or returned to their father.

{¶ 11} At the time of the hearing on March 24, 2005, the temporary-custody order was set to expire on May 7, 2005, see R.C. 2151.353(F), and Williams testified that the father would not be able to obtain employment or suitable housing or provide for the basic needs of his children by that time. Williams testified that CSB had investigated other relatives with respect to permanent placement of the children. However, there were none available at the time.

{¶ 12} Williams testified that permanent custody was in the best interest of the children rather than a planned permanent living arrangement because of the children's young ages and because there were no relatives to take custody. Williams conceded that the children expressed a desire to be returned to their father. However, she testified that once a case reaches planned-permanent-living-arrangement status, it is not guaranteed that the children will be able to remain in the current foster home. She testified that if the agency is granted permanent custody with adoption as a goal, the children would stay where they are while awaiting adoption and not be moved from foster home to foster home.

{¶ 13} The father testified in favor of the motion for the planned permanent living arrangement, stating that it would give him time to get his life together and prove to the court and the state that he is a productive person and a good parent. He also testified that he loved his children a great deal, that they loved him, and that he was working on finding housing, a job, and suitable daycare for his children if and when they were reunited.

{¶ 14} Crawford, a counselor at the New Destiny Treatment Center, testified that the father is cocaine dependent and alcohol dependent. He also testified that the father completed an anger-management course at New Destiny in 2005.

{¶ 15} Attorney Kimberly Nelson testified as the guardian ad litem for the Brown children that she did not think it was in the children's best interests to be placed with their father. She said that the foster mother is excellent but did not want to adopt. Nelson testified that her first recommendation would be to leave the children in the custody of the foster mother until they reach the age of 18. If that is not possible, Nelson recommended that CSB be granted permanent custody so the children could be placed for adoption.

{¶ 16} At the conclusion of the hearing, CSB asserted that a planned permanent living arrangement was not an alternative in this case because CSB had not made the request, and this family did not meet the requirements of such an arrangement. The juvenile court denied CSB's motion for permanent custody and granted the motion to have the children placed in a planned permanent living arrangement, finding that the court had the authority to make that placement

under R.C. 2151.353(A). CSB appealed that decision to the Ninth District Court of Appeals, and that court affirmed the juvenile court's decision.

{¶ 17} The court of appeals also certified a conflict between its decision and that of the Eighth Appellate District in *In re M.W.*, Cuyahoga App. No. 83390, 2005-Ohio-1302, 2005 WL 678111. The cause is now before this court upon our determination that a conflict exists. 107 Ohio St.3d 1694, 2005-Ohio-6763, 840 N.E.2d 201.

## II. History of Response to "Foster Care Drift"

{¶ 18} Allowing children to languish in foster care rather than establishing permanent homes for them has become so pervasive that a term has been coined to describe it: "foster care drift." "Drift occurs when children in placement lose contact with their natural parents and fail to form any significant relationship with a parental substitute." Garrison, Why Terminate Parental Rights? (1983), 35 Stan.L.Rev. 423, 426. In response to foster care drift, legislatures at both the national and state levels enacted new laws designed to shorten the length of time children spend in foster care and find permanent homes for foster children more quickly.

{¶ 19} The passage of the 1997 Adoption and Safe Families Act ("ASFA"), Pub.L. No. 105–89, Sections 673b, 679b, and 678, Title 42, U.S.Code, marked a shift toward focusing on a child's need for safety and permanency. 65 F.R. 4020–01. "The impetus for the ASFA was a general dissatisfaction with the performance of State[s]' child welfare systems in achieving these goals for children and families. The ASFA seeks to strengthen the child welfare system's response to a child's need for safety and permanency at every point along the continuum of care. In part, the law places safety as the paramount concern in the delivery of child welfare services and decision-making, clarifies when efforts to prevent removal or to reunify a child with his or her family are not required, and requires criminal record checks of prospective foster and adoptive parents. To promote permanency, ASFA shortens the time frames for conducting permanency hearings, creates a new requirement for States to make reasonable efforts to finalize a permanent placement, and establishes time frames for filing petitions to terminate the parental rights for certain children in foster care." Id.

{¶ 20} Around the time the federal legislation was enacted, there were 520,000 children in foster care. United States Department of Health & Human Services Adoption and Foster Care Analysis and Reporting System ("AFCARS") Report No. 1 (Jan.1999). Length of stay was a mean of 33 months and a median of 21 months, with 40 percent of children in foster care there for more than two and one-half years, including 16 percent for three to four years and 18 percent for five years or more. See http://www.acf.hhs.gov/programs/cb/stats_research/afcars/tar/report1/ar0199a.htm.

{¶ 21} By comparison, according to the most recent preliminary estimates for FY 2003, AFCARS reports that the mean length of stay has been reduced to 31 months and the median to 18 months. A third of all children in foster care have been there for more than two and one-half years, with 28 percent in foster care for three to four years and 16 percent in foster care for five years or more. AFCARS Report No. 10 (Apr.2005). See http://www.acf.hhs.gov/programs/cb/stats_research/afcars/tar/report10.htm

{¶ 22} In accordance with the intent of the Adoption and Safe Families Act, the average length of stay has shortened for a significant number of children. Ohio's own attempt to ensure that children would not stay in foster care indefinitely began in 1988 with the enactment of Am.Sub.S.B. No. 89 ("S.B. 89"). 142 Ohio Laws, Part I, 198. "These provisions were enacted in response to the problem of 'foster care drift.' They are aimed at preventing a child from foundering in foster care under a temporary custody order." *In re Watson* (May 31, 1994), Butler App. No. 93–06–114, 1994 WL 233157.

## III. Legal Analysis

{¶ 23} As part of S.B. 89, R.C. 2151.353(A) provides for the disposition of children who have been adjudicated abused, neglected, or dependent after the initial complaint is filed, giving the juvenile court six options: temporary custody, permanent custody, legal custody, protective supervision, a planned permanent living arrangement, and removal of the child pending further order of the court.

{¶ 24} A "planned permanent living arrangement" is defined as a placement that gives legal custody to an agency without terminating parental rights and that allows the agency to make an appropriate placement, including foster care or other placement. R.C. 2151.011(A)(36). Pursuant to R.C. 2151.353(A)(5), the court can order a planned permanent living arrangement *"if a public children services agency or private child placing agency requests the court to place the child in a planned permanent living arrangement* and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child and that one of the following exists:

{¶ 25} "(a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care.

{¶ 26} "(b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D) of section 2151.414 of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.

{¶ 27} "(c) The child is sixteen years of age or older, has been counseled on the permanent placement options available to the child, is unwilling to accept or unable to adapt to a permanent placement, and is in an agency program preparing the child for independent living." (Emphasis added.)

{¶ 28} The father in this case contends that after the initial disposition under R.C. 2151.353, all further motions for disposition are governed by R.C. 2151.415, which does not require CSB to request a planned permanent living arrangement before one can be granted by the trial court. The father bases this argument on a reading of R.C. 2151.415(F), which provides:

{¶ 29} "The court, on its own motion or the motion of the agency or person with legal custody of the child, the child's guardian ad litem, or any other party to the action, may conduct a hearing with notice to all parties to determine whether any order issued pursuant to this section should be modified or terminated or whether any other dispositional order set forth in divisions (A)(1) to (5) of this section should be issued."

{¶ 30} The case certified to be in conflict with the instant case is *In re M.W.*, Cuyahoga App. No. 83390, 2005-Ohio-1302, 2005 WL 678111. We find the analysis of the Eighth District Court of Appeals in *M.W.* persuasive:

{¶ 31} "It is longstanding law that the interpretation of a statute rests on the legislature's intent. *State ex rel. Francis v. Sours* (1944), 143 Ohio St. 120, 124 [28 O.O. 53], 53 N.E.2d 1021. The intent of the legislature resides first in the words used in the statute. *Provident Bank v. Wood* (1973), 36 Ohio St.2d 101, 105 [65 O.O.2d 296], 304 N.E.2d 378. If those words are unambiguous, we need go no further. *State v. Tuomala,* 104 Ohio St.3d 93, 2004-Ohio-[6239, 818 N.E.2d 272] at ¶ 21.

{¶ 32} "The wording of R.C. 2151.353(A)(5) is so unambiguous that we would be hard-pressed to find a clearer indication of intent. The statute states in no uncertain terms that the court may order a planned permanent living arrangement (1) [if] the county requests it, (2) [if] the planned permanent living arrangement would be in the best interests of the child, and (3) [if] one of the factors in subsections (A)(5)(a)-(c) exist[s]. While we understand that the best interests of the child are paramount in any custody case and that we are to liberally interpret the statutes to provide for the care and protection of the child, R.C. 2151.01(A), we cannot override unambiguous statutory language. Indeed, the juvenile courts derive their jurisdiction solely by grant from the General Assembly; thus, they do not have inherent equitable jurisdiction to determine a child's best interests. See *In re Gibson* (1991), 61 Ohio St.3d 168, 172, 573 N.E.2d 1074. We therefore restate the law in this district to be that a court may not order a planned permanent living arrangement unless it is requested by a

'public children services agency or private child placing agency.'" *In re M.W.,* 2005-Ohio-1302, 2005 WL 678111, ¶ 24–25.

{¶ 33} Indeed, it is our duty to give meaning and effect to the plain language of the statute as set forth by the General Assembly. R.C. 1.42. A planned permanent living arrangement places a child in limbo, which can delay placement in a permanent home. Because the General Assembly intended to encourage speedy placement, R.C. 2151.353 places limitations upon the use of planned permanent living arrangements.

{¶ 34} It appears that the juvenile judge's intent in placing the children in a planned permanent living arrangement was partly to keep the parental relationship intact so the children could perhaps be later reunited with their father. However, the children were first placed in the care of CSB in 2003 and as of the date of the permanent custody hearing in March 2005, the father still had not complied with the case plan, and there was no indication when compliance would occur.

{¶ 35} Moreover, although life with the foster mother in this case appears to be a loving and enriching one, the relationship lacks the permanency envisioned by the legislature. The foster mother could return the children at any point to the custody of children services. Even assuming that the children would be able to live with the foster mother until they reach the age of majority, they will "age out" of foster care. Children who age out of foster care lack the emotional support system and the financial stability of a permanent custody or adoptive relationship. Children who age out of foster care have no place to return for holidays, no permanent family to lean on as they enter the adult world. Thus, the General Assembly's grant of authority to request a planned permanent living arrangement, a temporary fix for foster children, solely to the CSB is in line with creating permanency and stability for these children.

{¶ 36} In addition, if the juvenile court were able to place the children in a planned permanent living arrangement without a request from the CSB, then R.C. 2151.415(C)(1) would be meaningless. R.C. 2151.415(C)(1) states that if an agency requests that the court place the child in a planned permanent living arrangement, the agency "shall present evidence to indicate why a planned permanent living arrangement is appropriate for the child, including, but not limited to, evidence that the agency has tried or considered all other possible dispositions for the child." This language indicates that a planned permanent living arrangement is to be considered as a last resort for the child, more evidence that the General Assembly's goal is to avoid allowing children to languish indefinitely in foster care.

## IV. Conclusion

{¶ 37} R.C. 2151.353(A)(5) is unambiguous and does not authorize the trial court to consider a planned permanent living arrangement unless the children services agency has filed a motion requesting such a disposition. Accordingly, we hold that after a public children services agency or private child placing agency is granted temporary custody of a child and files a motion for permanent custody, a juvenile court does not have the authority to place the child in a planned permanent living arrangement when the agency does not request this disposition. We, therefore, reverse the judgment of the court of appeals and remand the cause to the trial court for further proceedings not inconsistent with this decision.

Judgment reversed
and cause remanded.

MOYER, C.J., O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

RESNICK and PFEIFER, JJ., dissent.

---

**PFEIFER, J., dissenting.**

{¶ 38} R.C. 2151.01 states that R.C. Chapter 2151 "shall be liberally interpreted and construed so as to effectuate the following purposes:

{¶ 39} "(A) To provide for the care, protection, and mental and physical development of children subject to Chapter 2151. of the Revised Code, whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety;

{¶ 40} "(B) To provide judicial procedures through which Chapters 2151. and 2152. of the Revised Code are executed and enforced, and in which the parties are assured of a fair hearing, and their constitutional and other legal rights are recognized and enforced."

{¶ 41} To read the majority opinion is to believe that Chapter 2151. of the Revised Code has a third purpose: (C) To ensure that no planned permanent living arrangement—no matter how reasonable and no matter whether it is determined by the juvenile court to be in the best interests of the child—is to be made without the express approval of the children services agency.

{¶ 42} To be fair, the result reached by the majority is reasonable—if you read only R.C. 2151.353(A)(5), and out of context at that. You must ignore the fact that R.C. 2151.353(A)(5) applies only upon the initial adjudication that a child is abused, dependent, or neglected, which is not the case here. And you must ignore R.C. 2151.01, 2151.414, and 2151.415.

{¶ 43} As already suggested, R.C. 2151.01 does not state that children services agencies have paramount interests, but that children do. See *In re Cunningham* (1979), 59 Ohio St.2d 100, 105, 13 O.O.3d 78, 391 N.E.2d 1034 ("the primary consideration in questions of possession or custody of children" is the best interests of the child).

{¶ 44} R.C. 2151.414 and 2151.415(F) apply to modifications and terminations of initial dispositional orders. R.C. 2151.415 states that "[t]he court, on its own motion [or the motion of any party to the action] may conduct a hearing * * * to determine whether any order issued pursuant to this section should be modified or terminated or whether any other dispositional order set forth in divisions (A)(1) to (5) of this section should be issued. After the hearing and consideration of all the evidence presented, the court, in accordance with the best interest of the child, may modify or terminate any order issued pursuant to this section or issue any dispositional order set forth in divisions (A)(1) to (5) of this section."

{¶ 45} Among the dispositional orders permitted by R.C. 2151.415(A) is "(5) An order that the child be placed in a planned permanent living arrangement." Important to me, but apparently not to the majority, R.C. 2151.415(F), which authorizes a court to order a planned permanent living arrangement, does not require the court to receive a request from a children services agency. This omission makes sense. When a child is initially adjudicated abused, dependent, or neglected, when R.C. 2151.353(A)(5) controls, a children services agency is often in the best position to determine whether a permanent placement is necessary. By the time modifications or terminations of initial orders are necessary, when R.C. 2151.415(F) is supposed to control, the court is in the best position to determine whether a permanent placement is in the best interests of the child.

{¶ 46} Unfortunately, the majority opinion ignores the sensible, cohesive nature of the statutory scheme. Instead it has focused on a specific statutory provision, though not the one most relevant to the situation before us, and has determined, contrary to the intent of the General Assembly, that the interests of a public children services agency are paramount to those of the children. As the court of appeals stated, "Reading R.C. 2151.353(A) in isolation would give a children services agency more authority and discretion than the juvenile court to determine the appropriate placement of a dependent or neglected child. The overall scheme of the dependency and neglect statutes clearly demonstrates that the juvenile court, which is subject to appellate review, makes the ultimate decision regarding the disposition of each neglected and dependent child, not the children services agency." *In re A.B.*, Summit App. No. 22659, 2005-Ohio-4936, 2005 WL 2291869, ¶ 26. I would affirm the judgment of the court of appeals. I dissent.

RESNICK, J., concurs in the foregoing dissenting opinion.

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Philip D. Bogdanoff, Assistant Prosecuting Attorney, for appellant.

Charles J. Altwies, for appellee Charles Brown.

Katherine Hunt Federle and Jason A. Macke, urging affirmance for amicus curiae, Justice for Children Project.