DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Glenda Hill ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to three of her minor children and placed them in the permanent custody of Summit County Children Services Board ("CSB"). We affirm.
 {¶ 2} Although this case initially involved the custody of Mother's nine minor children, only three of the children are at issue in this appeal: U.B., born September 28, 1992; and twins R.G. and A.G., born November 23, 1999.[1] The father of these three children, Herbert Hill ("Father"), has since passed away and is not a party to this appeal.
 {¶ 3} The children were removed from their home on February 27, 2004 pursuant to Juv.R. 6 due to health and safety concerns. On March 1, 2004, CSB filed complaints, alleging that these three children were neglected and dependent due to the unsanitary and unsafe conditions of the home, which included broken windows, exposed electrical wires, and trash strewn about the house. A rat was seen running through the home; the home lacked food and appropriate furnishings; and the parents had failed to provide the children with dental or medical care and had not enrolled them in school.
 {¶ 4} After the children were removed from the home, CSB discovered that there was a long-standing problem with violence in this home, that even the oldest children had not attended school for most of their lives, and that the family had been involved with children services agencies in other counties. On June 1, 2004, the trial court adjudicated the children neglected and dependent and placed them in the temporary custody of CSB. CSB filed its first motion for permanent custody on January 14, 2005. Following a hearing on that motion during May 2005, the trial court found that CSB had failed to sustain its burden of proof and denied the motion for permanent custody. The trial court instead granted Mother's motion for a six-month extension of temporary custody.
 {¶ 5} On February 15, 2006, CSB again moved for permanent custody. Following a hearing during April 2006, the trial court found that the three children had been in the temporary custody of CSB for at least 12 of the prior 22 months and that permanent custody was in their best interests. Consequently, it terminated Mother's parental rights and placed U.B., R.G., and A.G. in the permanent custody of CSB. Mother appeals and raises two assignments of error.
 ASSIGNMENT OF ERROR I
"The trial court's decision denying Mother's motion for legal custody and granting CSB's motion for permanent custody was against the manifest weight of the evidence, contrary to law and/or an abuse of discretion and was not in the best interest[s] of the minor children."
 {¶ 6} Through her first assignment of error, Mother challenges the trial court's decision to place U.B., R.G., and A.G. in the permanent custody of CSB. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re WilliamS. (1996), 75 Ohio St.3d 95, 99. The trial court found that the first prong of the test was satisfied because U.B., R.G., and A.G. had been in the temporary custody of CSB for at least 12 of the prior 22 months and Mother does not contest that finding. Mother challenges only the best interest prong of the permanent custody test.
 {¶ 7} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C.2151.414(D)(1)-(4).[2]
 {¶ 8} Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. SeeIn re Smith (Jan. 2, 2002), 9th Dist. No. 20711, 2002-Ohio-34; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.
 {¶ 9} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, 481 N.E.2d 613, quoting Cross v.Ledford (1954), 161 Ohio St. 469, 120 N.E.2d 118, paragraph three of the syllabus.
 {¶ 10} For more than two years, the children lived away from Mother and, during that time, their interaction with her was limited to weekly, supervised visits at the visitation center. Mother attended visits fairly regularly and the children were always happy to see her. CSB's primary concern about Mother's interaction with the children during visits was that she did not set appropriate boundaries for them nor did she often intervene to correct their behavior when they acted inappropriately.
 {¶ 11} Mother's visitation with her children had never progressed beyond supervised visits at the visitation center because Mother had made very little progress on her case plan. CSB had serious concerns about Mother's ability to protect her children from violent men and her ability to meet their basic needs, and Mother had done very little to address her parenting problems.
 {¶ 12} When the children first came into CSB custody, they did not know how to care for their own personal hygiene, they were far behind academically not due to any developmental delays but because their parents had not sent them to school or home-schooled them with any recognized curriculum, and it became apparent through counseling that the children had lived a life of violence, fear and isolation in the home of Mother and Father.
 {¶ 13} After being removed from the home, the children were flourishing in foster care. With the help of counseling and extra academic attention, each child was making significant progress socially and academically. U.B., more so than her younger siblings, was still in need of continued counseling, as she had witnessed much of the violence within her home and her counselor was concerned that she carried much of her mother's anger. The twins, R.G. and A.G., were much younger and had not spent as many years in Mother's home. The twins had been living with the same foster family since the case began. They were doing well there and the foster parents had expressed an interest in adopting them.
 {¶ 14} As the guardian ad litem had testified at the first permanent custody hearing in May 2005, she had no doubt that the children and Mother love each other and are bonded, but she stressed that love alone cannot "overcome the history of such long-term violence in the home, verbal abuse, failure to maintain safe and stable living conditions for the children, failure to appropriately supervise and redirect the children * * * and failure to educate the children[.]" At the second hearing nearly one year later, little had changed. Mother did not even seem to recognize the severity of the problems in her home or that she needed to make changes to be reunited with her children.
 {¶ 15} The guardian ad litem spoke on behalf of all three children. The guardian ad litem recognized that all of the children expressed a desire to be reunited with their mother, but she opined that permanent custody was in their best interests. She stressed the long-standing serious problems in this family's home and that Mother had made very little progress toward remedying any of them. The guardian ad litem expressed her continuing concern that Mother has a "propensity to seek out men who mistreat her and her children" and that Mother has "routinely over a course of years placed herself in unsafe, unhealthy situations and her kids in those same situations[.]" She noted that, after two years, Mother had been unable to separate and protect even herself from Father.
 {¶ 16} These children had lived most of their lives with Mother and Father but it was apparent that their lives had been plagued with violence and isolation and Mother had not met even their basic needs for food, shelter, education, and medical attention. The family had been involved with social services agencies in different counties but, because they kept moving, those agencies had not been able to help them improve their living conditions.
 {¶ 17} These children had been in the temporary custody of CSB for nearly two years. This Court has repeatedly stressed, however, that a long period of temporary custody "in and of itself cannot be held against the parent without considering the reasons for it and the implications that it had on this child."In re Smith, at *5. During this lengthy period, the trial court denied CSB's first motion for permanent custody, giving Mother additional time to work toward reunification of her family. The primary goals for Mother were that she break the cycle of violence and achieve emotional and financial independence from Father, particularly given that Father had refused to work with CSB toward reunification.
 {¶ 18} Prior to the children's removal, Mother had raised her family in a home full of violence and she had done virtually nothing during the two years to establish a safe and stable home for her children. Mother continued to be dependent on Father, who had been abusive toward her from the beginning of their relationship. When Mother first met Father many years ago, he physically overpowered her and forced her to have sex with him. Father physically abused Mother in the children's presence and several of the older children had assumed the role of Mother's protector. They would try to intervene in the fights and had even plotted acts of violence against Father. Father had physically abused several of the children as well and Mother suspected that he had also sexually abused one of her older daughters. The entire family had lived in fear of Father and, as Mother explained, they all had learned how to "deal" with him by being very quiet.
 {¶ 19} Despite all of the violence in the home, Mother had remained there with her children for sixteen years. She had never called the police for help, nor had she removed the children from the home. Mother testified that she had taken steps to remove the children from the situation, but after they left the home, they had nowhere to go. She explained that she had too many children and no one would take them in. Thus, according to Mother, she would occasionally remove the children from the situation but they would eventually return to Father's home because she was financially dependent on him.
 {¶ 20} Mother had a long history of establishing relationships with men who abuse her physically and/or verbally. Before Mother became involved with Father, she had been involved with at least two other men, the fathers of some of her older children, who had been abusive to her. Mother's father also had physically abused her and her sisters when she was a child. CSB tried to focus Mother on breaking this long cycle of violence, but Mother did not seem to recognize that she had a serious problem.
 {¶ 21} Mother had failed to address the psychological aspects of her life-long tendency to involve herself and her children in abusive relationships. Mother testified that she did not dwell on the problems with her past and that she did not need any therapy. Mother was required to attend weekly counseling sessions, but attended only nine sessions in one year. Mother completed a two-day "Stop the Cycle" program, but then resumed her contact with Father, admitting that she needed to return to him because she was financially dependent on him.
 {¶ 22} Mother seemed to believe that her abusive relationship with Father was resolving itself because he was old and ill and could no longer overpower her physically. She had not addressed, nor did she seem to appreciate, the concerns of the guardian ad litem, CSB, and Mother's counselor that Mother would most likely repeat the cycle and become financially dependent on another abusive man.
 {¶ 23} One of CSB's primary goals for Mother was for her to achieve financial independence so that she and her children would not need to be depedent on a man. Mother has never worked and, during the two years that her children were in CSB temporary custody, she did not actively seek employment. According to her therapist, Mother would talk about what she could do to earn money, but she never actually got to the point of submitting job applications. Several witnesses testified that, although Mother has no particular skills or education, she is qualified to work at an entry-level position and there is no reason that she should not be able to find employment.
 {¶ 24} Mother did not seem to recognize the need for her to achieve financial independence, however. When she testified at the permanent custody hearing, Mother explained that she was raised to be dependent on a man. She admitted that she had only submitted one job application in the past two years and indicated that she does not want to work because she wants to stay at home with her children and be a housewife.
 {¶ 25} There was evidence that these children, after two years in CSB custody, needed a legally secure permanent placement. Neither parent was prepared to take custody of them, nor were there any suitable relatives available. Thus, the trial court reasonably concluded that a legally secure permanent placement could only be achieved by granting CSB permanent custody.
 {¶ 26} Given the evidence before the trial court on each of the best interest factors, the trial court reasonably concluded that permanent custody was in the best interests of U.B., R.G., and A.G. The first assignment of error is overruled.
 ASSIGNMENT OF ERROR II
"The trial court's decision to deny the guardian ad litem's motion for [PPLA] was against the manifest weight of the evidence, contrary to law and/or an abuse of discretion and was not in the best interest of the minor child."
 {¶ 27} Mother next contends that the trial court erred in denying the motion of the guardian ad litem to place her child, U.B., in a planned permanent living arrangement ("PPLA"). Since the trial court's decision in this case, the Ohio Supreme Court reversed a decision of this Court, which had held that the juvenile court has broad authority under R.C. 2151.415(F) to place children in a PPLA, even though such a placement had not been requested by the agency. See In re A.B.,110 Ohio St.3d 230, 2006-Ohio-4359.
 {¶ 28} In In re A.B., the Supreme Court held that, unless the children services agency moves for a PPLA placement of the child pursuant to R.C. 2151.353(A)(5), the trial court is without authority to consider such a dispositional option. Because it was the guardian ad litem and not CSB who requested the PPLA placement in this case, the trial court had no authority to place U.B. in a PPLA. Therefore, it did not err in denying the motion. The second assignment of error is overruled.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Carr, J., Boyle, J., Concur.
[1] Although the case caption includes the name of a fourth child, R.B., Mother has not assigned error to the trial court's disposition of that child. This Court will confine its discussion to the three children at issue in this appeal.
[2] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.