[Cite as *In re M.H.*, 2013-Ohio-5565.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

IN RE: M.H.

C.A. No.    27031

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    DN11-10-0710

DECISION AND JOURNAL ENTRY

Dated: December 18, 2013

HENSAL, Judge.

{¶1}    Appellant, Sheri H. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, M.H., and placed her in the permanent custody of Summit County Children Services ("CSB"). This Court affirms.

I.

{¶2}    Mother is the sole surviving parent of M.H., born October 9, 1997. M.H.'s father died in 2005.

{¶3}    CSB became involved with the family on October 7, 2011, after M.H. threatened to kill herself while at school. School personnel were unsuccessful in their efforts to reach Mother, and instead reached Tyler Nichols, who identified himself as the child's uncle. Mr. Nichols retrieved M.H. from school. Police went to the home and found it to be in deplorable condition, with cockroaches and other insects, debris all around, and a foul odor. Police

determined that Mr. Nichols was not the child's uncle, but, in fact, was a convicted sexual offender. Thereupon, the police took custody of M.H. pursuant to Juvenile Rule 6 and contacted CSB.

{¶4} On October 11, 2011, CSB opened a voluntary case with Mother based on an agreement that Mr. Nichols would leave the home, the home would be cleaned, and M.H. would be seen by mental health professionals. M.H. was to stay at Safe Landing for a short period of time while those goals were supposedly being achieved.

{¶5} When CSB and the police returned for a welfare check on October 20, 2011, they found M.H. and Mr. Nichols alone in the home, with Mr. Nichols hiding in a closet. Accordingly, the police removed M.H. and took her to Safe Landing once again. CSB had received reports from school officials, expressing concern with M.H.'s welfare as well as with Mother's mental health. They reported that M.H. had been doing very poorly academically and was regularly teased for her poor hygiene. CSB filed a complaint in juvenile court the next day, alleging that M.H. was an abused, neglected, and dependent child, and sought temporary custody of her.

{¶6} Following hearings and upon stipulation of the parties, M.H. was adjudicated abused, neglected, and dependent and was placed in the temporary custody of CSB. The trial court adopted a case plan that addressed Mother's mental health, safety issues for M.H, and the condition of the home. Mother was to complete a psychological evaluation, engage in counseling, and gain better parenting skills. Mr. Nichols was required to have no contact with M.H. Mother's visitation with M.H. was to be supervised.

{¶7} Mother made little progress in achieving her reunification goals, and on September 20, 2012, CSB moved for permanent custody. Mother opposed the motion and

sought a six-month extension of temporary custody instead. In addition, Mother and the guardian ad litem each sought a continuance of the proceedings and requested that CSB screen M.H. for disposition to a planned permanent living arrangement ("PPLA"). Following a hearing, the trial court granted CSB's motion for permanent custody and denied all other pending motions. Mother now appeals and assigns one error for review.

II.

**Assignment of Error**

> THE TRIAL COURT ABUSED ITS [DISCRETION] WHEN IT GRANTED THE STATE'S MOTION FOR PERMANENT CUSTODY.

{¶8} Mother asserts that the trial court erred when it granted permanent custody of M.H. to CSB. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶9} The trial court found that the first prong of the permanent custody test was satisfied because M.H. could not be placed with Mother within a reasonable period of time or should not be placed with Mother. *See* R.C. 2151.414(B)(1)(a). In support of that finding, the trial court relied on R.C. 2151.414(E)(15) and R.C. 2151.414(E)(2).

{¶10} In regard to R.C. 2151.414(E)(15), the trial court found that the abuse and neglect of M.H. was so serious and the likelihood of recurrence was so concerning that any return to Mother presented a threat to the child's safety. The trial court relied on evidence that Mother had allowed Mr. Nichols, a 21-year-old friend of Mother's then boyfriend, to live in her home. Mr. Nichols had previously been found to be a sexually violent offender in the State of Illinois. Mother not only permitted, but encouraged a sexual relationship between Mr. Nichols and 14-year-old M.H. Mother had Mr. Nichols wait for M.H. in her bedroom when she came home from school. Mother and M.H. would engage in "moaning contests" from their bedrooms. Even after Mr. Nichols was convicted for unlawful sexual conduct with M.H., Mother continued to assure him that M.H. would be available to him when she turned 18-years-old. Also, Mother passed illicit messages from Mr. Nichols to M.H. during visits - until the conduct was discovered and stopped by CSB.

{¶11} The psychologist who evaluated and treated Mother testified that "[m]other has not only been sexually inappropriate with her daughter but has facilitated and vicariously participated in her daughter's sexual abuse." Mother's relationship with her daughter was such that she reportedly discussed her sex life with her daughter. According to the psychologist, although Mother knew Mr. Nichols was not supposed to be in her home, she was willing to "risk it all" to allow him to return there to be with her daughter. Mother encouraged M.H. to tell others that Mr. Nichols was her uncle. The psychologist believed Mother had failed to gain sufficient insight into how her decisions had affected M.H. and would continue to affect her throughout her life. Consequently, the evidence supported the trial court decision that returning M.H. to Mother's care would pose a threat to M.H.'s physical and mental safety. *See* R.C. 2151.414(E)(15).

{¶12} Next, in regard to R.C. 2151.414(E)(2), the trial court found that Mother has a chronic mental illness that is so severe as to make it impossible for her to provide M.H. with an adequate permanent home. The trial court pointed to evidence that Mother speaks of her multiple personalities and tries to "call out" multiple personalities in M.H. as well. The trial court also cited evidence that M.H.'s behavior regressed significantly when she was with Mother, as compared to her behavior when with her foster family. For example, when Mother and M.H. are together, they often lick each other's faces. In an effort to address these concerns, Mother was referred to a sex offender group through Summit Psychological Associates, but she attended only ten sessions of the two-year program. Consequently, the evidence supported the trial court finding that Mother's chronic mental illness makes her unable to provide an adequate permanent home for her child. *See* R.C. 2151.414(E)(2).

{¶13} On appeal, Mother challenges the trial court's second prong finding that permanent custody is in the best interest of the child. When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in R.C. 2151.414(D): the interaction and interrelationships of the child, the wishes of the child, the custodial history of the child, and the child's need for permanence in his or her life. *See In re R.G.*, 9th Dist. Summit Nos. 24834 & 24850, 2009-Ohio-6284, at ¶ 11. "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." *In re Smith*, 9th Dist. Summit No. 20711, 2002 WL 5178, *3, (Jan. 2, 2002); *see also In re Palladino*, 11th Dist. Geauga No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.

{¶14} The first best interest factor requires consideration of the relevant personal interactions and interrelationships of the child. The relationship between Mother and daughter is

central to this case and several witnesses addressed it in their testimony. The two psychologists who evaluated Mother and daughter each accepted that there was a bond between two, but affirmed that it was not a healthy bond. Mother's counselor similarly explained that Mother had unhealthy boundaries with her daughter and broached those boundaries with inappropriate sexual conversations with her. Mother's counselor believed Mother viewed M.H. more as a friend and confidante than as a daughter. The CSB case worker also described the relationship between Mother and daughter as more like a friendship and explained that they often talked about adolescent-type issues, such as marriages and divorces of celebrities or fashion shows, during visits. They also talked about Mother's current boyfriends and her wedding plans, despite the caseworker's consistent efforts to urge Mother to take an interest in M.H.'s activities instead. The guardian ad litem acknowledged that M.H. has a relationship with Mother, but would not call it a bond. She believes that M.H. has assumed the greater share of the parental role in their relationship.

{¶15} Mother was diagnosed by her psychologist as being codependent, explained as having the "need to be with another person[,] most likely a male person." Mother's willingness to allow Mr. Nichols back into her home was apparently done, at least in part, to secure his help in locating her previous boyfriend who was known to Mr. Nichols. The psychologist explained that Mother regularly moved from one relationship to another and could not tolerate being alone. She sought direction and guidance from her partners and almost immediately became preoccupied with marriage.

{¶16} Mother's counselor and psychologist agreed that Mother lacks insight into the problematic nature of the relationship between M.H. and Nichols. Mother believed that because she was permitting Mr. Nichols to have a relationship with her daughter and it was occurring in

her home, it was acceptable. Rather than having any concern about the effects of Mr. Nichols' involvement with M.H., Mother was invested in helping them maintain a relationship. In fact, according to the psychologist, Mother remains so invested and labels their separation as temporary. Unfortunately, after more than a year of therapeutic efforts, Mother's progress was described as very minimal and estimated at less than 5%. More significant, perhaps, is the fact that she lacks motivation to succeed in her treatment. Mother made it very clear to her psychologist that she is not in treatment because she believes she needs it, but only to pacify those who have requested that she engage in it. Given Mother's lack of progress, her counselor believes that Mother would continue to have difficulties in understanding her parental role, in knowing how to discipline a child, and in keeping her daughter safe.

{¶17} At the same time, M.H. has also been seen by a psychologist and has worked with a counselor on a weekly basis since her removal from Mother's home. That psychologist reported that, initially, M.H. was very confused, was stressed, and had fluctuating moods. Her counselor indicated that fourteen-year-old M.H. reported having sex with Mr. Nichols on several occasions. She considered him her boyfriend and that they were planning on getting married. In her mind, at that time, there was nothing wrong with this behavior.

{¶18} The psychologist's primary concern was to guard M.H.'s safety because of her obsession with sexual situations and her highly sexualized behavior. She hoped to help M.H. reduce the guilt and stress she felt as a result of the fact that she was no longer residing with Mother. She also sought to assist M.H. in developing an understanding of an appropriate role for a child in a family, a healthy understanding of her relationships with adults and sexual relationships with others, and the ability to establish safe boundaries.

{¶19} Since M.H. came into treatment, both therapists agree that she has made a great deal of progress. She is no longer focused on sexualized issues and is trying to interact with people on a more age-appropriate level. Her counselor described M.H. as funny, charming, kind, and insightful as to what she now wants and what she is looking forward to in her life. She is also appreciative of what her foster parents have done for her. The psychologist attributes M.H.'s progress to being in a stable placement with consistent rules and boundaries and to M.H.'s ability to think more clearly than before her removal when she was distressed and confused. The psychologist believes that ongoing therapy will be helpful.

{¶20} Several witnesses, including M.H.'s psychologist, a supervising case aide, the CSB caseworker, and the guardian ad litem were able to observe Mother and M.H. together during visits. The psychologist reported that M.H. is happy to see Mother at weekly visits and is disappointed if Mother leaves early or is unable to be there. She noted, however, that M.H. regressed in her behavior when she was with Mother, even using "baby talk." The case aide similarly testified that M.H. behaves very differently with Mother as compared to other people. When she is with Mother, M.H. would be overly playful: using child-like speech, sitting on Mother's lap, jumping on her lap, licking her face, acting very touchy-feely, playing with hair, making bodily noises - passing gas or burping in Mother's face. According to the case aide, Mother seemed to find this behavior normal. The caseworker observed that M.H. has now come to realize that such behavior is inappropriate and has taken on the role of making sure their interaction is proper so Mother does not get in trouble. M.H. has reported that she is concerned for Mother and worries that Mother will continue to make the same decisions as in the past and that she has not learned from this experience.

{¶21} The guardian ad litem also noted a difference between M.H.'s behavior during visitation and at the foster home. During visits with Mother, M.H. was very conscious of her body, frequently looking at her reflection in the window. The guardian ad litem described M.H. as somewhat sexualized in her behavior and more animated and overactive during visits with Mother. By way of contrast, in the foster home, she was very calm, appeared to be mature, conversed naturally, and seemed comfortable in the situation and with herself.

{¶22} Regarding M.H.'s other relationships, M.H. has two half-sisters, each of whom resides with different relatives. M.H.'s relationship with them has varied, but she would like to have some continuing contact with them. A third half-sister is deceased.

{¶23} The guardian ad litem reported that M.H. never stated that she wanted to return to Mother, except at one point, as the permanent custody hearing continued on over the course of three months. On that one occasion, M.H. said she wanted to go home because she just wanted this to be over. She said she felt like she was stuck moving through the legal process. Subsequently, M.H. stated again that she would prefer to be adopted into a permanent home. According to the guardian ad litem, M.H. has not indicated whether she wishes to have continued contact with Mother, but she has said that she would like to have continued contact with her half-sisters if possible.

{¶24} M.H.'s counselor and the caseworker testified similarly. The counselor stated that M.H. loves her mother, but is ready for permanent custody and adoption. According to that witness, M.H. does not necessarily feel that Mother is committed to her. The caseworker reported that M.H. indicated multiple times that she wants to move forward. While she loves her mother, she realizes that she has done better in her current foster home and wants this process to

be over. Both witnesses believe that M.H. understands that any future relationship with her biological family would depend on her adoptive family.

{¶25} The guardian ad litem believes that it would be in the best interest of M.H. to be placed in the permanent custody of CSB and that an adoptive placement should be sought. She concluded that Mother has not taken responsibility for the situation and still does not believe that Mr. Nichols was a sexual offender. The guardian ad litem believes that Mother does not understand M.H.'s perspective, feelings, needs, or what is in her best interest. Nor does she accept advice from professionals. The guardian ad litem believes that M.H. has made a great deal of progress, but is still very vulnerable. She is very influenced by the people around her and needs structure to become a productive adult.

{¶26} The custodial history of M.H. reflects that she was living with Mother at the time of her removal in October 2011. Mr. Nichols and Mother's boyfriend were also staying in the home at that time. M.H. considered each of Mother's boyfriends as stepfathers in turn. Following M.H.'s removal, she had two short stays at Safe Landing. Her first foster placement was in a traditional foster home, but she was soon removed to Beech Brook for an intensive level of residential care because of her difficult and sexualized behavior. Thereafter, she was placed in a therapeutic foster home, which was described as a very structured and nurturing situation. M.H. did well there and reported to her psychologist that she felt safe in that home.

{¶27} As to the fourth best interest factor, there was evidence before the trial court that M.H. was in need of a legally secure placement. The caseworker attested to making very concerted efforts to find relatives who might provide care for M.H., but was unable to find suitable relatives. The caseworker does not believe Mother has substantially complied with any part of her case plan. She is in the very beginning stages of most of her groups and therapy and

is still focusing on some very basic issues. She has not been able to gain insight into her own situation. Nevertheless, she believes M.H. has a support system of counselors and therapists that will assist her going forward. While her foster parents have been very committed to M.H., they are not currently in a position to adopt her.

{¶28} According to the guardian ad litem, M.H. has developed a great deal of insight as to the difficulties of her past and what she should be doing in the future. She now knows right from wrong and has an understanding of the role of Mother versus daughter. She does well in school and is often on the merit role. While she is still vulnerable to the attitudes and wills of other people, she is better able to self-protect and self-report.

{¶29} Finally, Mother argues that the trial court should have granted a six-month extension of temporary custody, at least partly, in the hopes that CSB might then recommend that the nearly 16-year-old M.H. would be placed in a PPLA. The juvenile court was otherwise without authority to place the child in a PPLA, because CSB did not file a motion requesting such a disposition. *See In re A.B.,* 110 Ohio St.3d 230, 2006–Ohio–4359, ¶ 37.

{¶30} An extension of temporary custody should only be made where it would be in the best interest of the child. Because this Court has determined that permanent custody to CSB was in the best interest of M.H., it would be inconsistent to conclude that an extension of temporary custody would also be in her best interest. *See In re R.H.*, 9th Dist. Summit No. 24537, 2009-Ohio-1868, at ¶ 15. In addition, the caseworker offered testimony that she did not believe that reunification with Mother was likely even if a six-month extension were granted. Furthermore, as to the option of PPLA, the caseworker asserted that PPLA would leave M.H. in limbo and is not fair to her. She stated that M.H. deserves a family that will love and care for her. The caseworker also testified that she explained PPLA to M.H., and she responded that she did not

want to remain in foster care for the rest of her childhood. To this point, the guardian ad litem testified that she had considered the merits of PPLA, but concluded there should be a "clean break" and that M.H. deserves a chance to have her own life, to develop a life that is right for her. She believes that involvement with her family would impede that progress. The trial court did not err in denying the motion for an extension of temporary custody.

{¶31} The record demonstrates that there was ample evidence before the trial court from which it could conclude that permanent custody was in the child's best interest. The trial court did not err in denying the motion for a six-month extension of temporary custody, in granting CSB's motion to terminate Mother's parental rights, and in placing M.H. in the permanent custody of CSB. Mother's sole assignment of error is overruled.

### III.

{¶32} Mother's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JENNIFER HENSAL
FOR THE COURT

MOORE, P. J.
WHITMORE, J.
CONCUR.

APPEARANCES:

ADAM VAN HO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.