JOURNAL ENTRY AND OPINION
{¶ 1} Appellants, A.D.,[1] mother, and D.T., father, challenge the judgment of the juvenile court that awarded permanent custody of their son, M.T., to the Cuyahoga County Department of Children and Family Services ("CCDCFS"). For the reasons set forth below, we affirm.
 {¶ 2} On February 25, 2006, the mother gave birth to M.T. Three days later, CCDCFS filed a complaint for permanent custody of M.T., alleging the child to be a dependent. On that same date, M.T. was placed in the emergency custody of CCDCFS. On March 1, 2006, the court ordered M.T. into the temporary custody of CCDCFS. On April 18, 2007, after an adjudicatory hearing, the child was found dependent.
 {¶ 3} The dispositional hearing was held on June 12 and June 13 of 2007. Present at the hearing were the mother and her counsel, the father and his counsel, assistant prosecutors, the social worker on the case, Eric Ploscik, and the guardian ad litem for the child, Thomas Kozel ("GAL"). Prior to the hearing, the father stipulated to the paternity of M.T. The mother stipulated that she had a ten year history of drug abuse, had been unable to maintain her sobriety, was at the time incarcerated for two years, has an older child, D.T., a sibling to M.T., in the permanent custody of CCDCFS and that her parental rights in regards to that child were involuntarily terminated. *Page 4 
 {¶ 4} At the dispositional hearing, the trial court heard the testimony of the following individuals: Eric Ploscik, the social worker for the case, the father, his sister and his brother. The testimony and evidence proffered at the hearing demonstrated the following facts.
 {¶ 5} Social worker, Eric Ploscik, testified that he had been involved with the mother and father since October of 2004 after M.T.'s older sibling, D.T., was born positive for cocaine, marijuana and opiates. The parents refused to participate in the reunification plan for D.T. Accordingly, the court found D.T. neglected and awarded CCDCFS permanent custody of the child.
 {¶ 6} Ultimately, D.T. was adopted by the father's sister. The father explained that he did not participate in any manner in the case plan because he knew his sister, who always wanted children but could not have her own, was going to adopt D.T., whom he believed to be a special needs child.
 {¶ 7} After CCDCFS was awarded permanent custody of the child, D.T., on February 25, 2006, the mother gave birth to M.T. Within days, CCDCFS removed him from the parents.
 {¶ 8} A reunification case plan was implemented for the mother and father in regards to M.T. The plan required both parents to participate in substance abuse assessment, submit to random urine screens, attend parenting education, and obtain suitable housing and employment. The mother was also to complete anger *Page 5 
management classes and the father was to complete a paternity test. Ploscik testified that he discussed the objectives of the case plan with both parents.
 {¶ 9} The mother failed to comply with any of the directives, and instead, relapsed into drug use and was incarcerated.
 {¶ 10} With regards to the father's case plan, Ploscik testified that the father was asked to submit to a paternity test at M.T.'s birth in February of 2006. The father, however, did not comply with that request until August of 2006.
 {¶ 11} Additionally, Ploscik testified that as part of the case plan, he referred the father to parenting classes on six separate occasions. When the father finally attended the classes, it took him six months to complete a 12-week program.
 {¶ 12} Ploscik also testified that he suspected the father was involved in substance abuse. Accordingly, CCDCFS requested random urine screens on 35 separate occasions. The father submitted to only four with all results being negative. None of the tests, however, were performed within 24 hours of when the request was made. The father maintains he submitted to six urine tests and four breathalyzers. CCDCFS never requested any breathalyzer tests. Additionally, it is unclear as to whether all six tests the father claims he performed were those requested by CCDCFS. He also explained that he did not submit to the random urine tests because he was unable to obtain transportation to the testing center.
 {¶ 13} Ploscik also testified to the father's unwillingness to visit M.T. Ploscik testified that the father was informed that bi-weekly visits with M.T. were to begin on *Page 6 
March 7, 2006. The father, however, failed to visit or communicate with the child in any manner until August 15, 2006. Moreover, between February and December of 2006, the father only visited M.T. on three occasions. In all, the father only attended 14 of the scheduled 34 visits. The father explained his absence by stating that he began visiting once paternity was established. Furthermore, Ploscik testified that when he observed the father with M.T., he noticed that the father seemed nervous and anxious and that most of the interaction during the visits was between the child and the father's girlfriend.
 {¶ 14} In regards to employment, the father testified that he had steady employment for five months prior to the hearing. He provided pay stubs as evidence of this employment. He explained his previous lapse of employment by maintaining he was unable to work due to an injury to his back resulting from an accident. There were no concerns about the house in which he was residing or the living environment.
 {¶ 15} Also, the evidence established that the father was on probation from a recent criminal conviction for robbery, theft and aggravated theft. As part of his probation, the father was ordered to attend drug treatment, participate in random urine screens, and attend regular substance abuse meetings. The father did not complete all of these directives.
 {¶ 16} Ploscik testified that he was quite concerned that the parents were absent during the crucial bonding phase of M.T.'s life. Ploscik explained that the *Page 7 
child had been with his foster parents since birth. As a result, a substantial bond existed between M.T. and his foster parents. Additionally, the foster parents wished to adopt the child. (Tr. 59.) No other individuals announced their desire to adopt.
 {¶ 17} After the presentation of Ploscik's testimony, the father moved for a directed verdict. The court denied that request and the father testified on his own behalf. Additionally, the court heard the testimony of his sister and brother. They confirmed the father's testimony and stated they would assist in raising M.T. Additionally, the father testified that he served as a foster parent for his niece and nephew for over one year.
 {¶ 18} The report of the guardian ad litem, Thomas Kozel, recommended permanent custody to CCDCFS. He explained that the parents lacked commitment to the child by failing to regularly visit or communicate with the child and by failing to meet the objectives of the reunification case plan.
 {¶ 19} After presentation of the evidence, the dispositional hearing ceased and the trial court announced it would issue its decision after a thorough review of the evidence.
 {¶ 20} In a judgment entry filed July 9, 2007, the trial court issued its decision granting permanent custody of M.T. to CCDCFS. The court determined by clear and convincing evidence that the child cannot and should not be placed with either parent within a reasonable time for the following reasons: *Page 8 
 {¶ 21} "Following the placement of the child outside the home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the mother and father have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home."
 {¶ 22} "Mother has a chronic chemical dependency that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the Court holds the hearing in this matter."
 {¶ 23} "Mother and Father have demonstrated a lack of commitment towards the child by failing to regularly support, visit, or communicate with the child when able to do so, or by their other actions, have shown an unwillingness to provide an adequate permanent home for the child."
 {¶ 24} "Mother and Father have abandoned the child."
 {¶ 25} "Mother and Father have had parental rights terminated involuntarily with respect to a sibling of the child."
 {¶ 26} "Mother is incarcerated at the time of the filing of the complaint and will not be available to care for the child for at least eighteen months after the filing of the complaint for Permanent Custody." *Page 9 
 {¶ 27} The court further determined that the order for permanent custody is in the best interest of the child. Finally, the court found that reasonable efforts were made by CCDCFS to prevent the removal of the child by substance abuse assessment, urine screens, parenting classes and employment. The court approved adoption as the permanency plan.
 {¶ 28} Both the mother and father appealed the trial court's judgment awarding permanent custody of M.T. to CCDCFS. The two appeals have been consolidated for our review.
 {¶ 29} In her appeal, the mother asserts two assignments of error for our review. These assignments of error state:
 {¶ 30} "I. The trial court erred in awarding permanent custody to CCDCFS when appellant was not afforded effective assistance of counsel."
 {¶ 31} "II. Appellant was denied her Due Process rights when she was not afforded the opportunity to be present at the permanent custody proceeding."
 {¶ 32} In these two assignments of error, the mother maintains that her counsel was ineffective for failing to explain on the record her absence at the permanent custody hearing and that the trial court violated her Due Process rights by failing to obtain a waiver of her presence at that same hearing. A review of the record, however, indicates that the mother was present at the hearing. The transcript demonstrates that at the onset of the hearing, the trial judge noted her presence. Additionally, the mother verbally responded to a question of the judge. *Page 10 
Finally, the court's journal entry filed on July 9, 2007 lists her as being present. Accordingly, we find both of the mother's assignments of error, each contingent upon her attendance at the hearing, without merit.
 {¶ 33} Having overruled the mother's assignments of error, we next address the father's two assignments of error. His first assignment of error states:
 {¶ 34} "The trial court erred when it granted the motion for permanent custody."
 {¶ 35} Within this assignment of error, the father contends that CCDCFS failed to establish by clear and convincing evidence that it should have permanent custody of M.T. We disagree.
 {¶ 36} R.C. 2151.353(A) authorizes a trial court to commit a child to the permanent custody of a children services agency when it determines by clear and convincing evidence that the child cannot or should not be placed with either parent in accordance with R.C. 2151.414(E), and that permanent custody is in the best interest of the child pursuant to R.C.2151.414(D).
 {¶ 37} "Clear and convincing evidence" is evidence that creates in the trier of fact a firm belief or conviction as to the allegations sought to be established. In re Holcomb (1985), 18 Ohio St.3d 361, 368,481 N.E.2d 613; Cross v. Ledford (1954), 161 Ohio St. 469, 477,120 N.E.2d 118. Where the burden of proof is clear and convincing, a reviewing court must examine the record to ascertain whether the trier of fact had sufficient evidence before it to satisfy the requisite burden of proof.In re *Page 11 B.L., Franklin App. No. 04AP-1108, 2005-Ohio-1151. Accordingly, we limit our review of the weight of the evidence to whether competent, credible evidence existed to support the trial court's determination. In reStarkey, 150 Ohio App.3d 612, 617, 2002-Ohio-6892, 782 N.E.2d 665.
 {¶ 38} The trial court's authority to grant permanent custody of a dependent child to CCDCFS is stated in R.C. 2151.414(B):
 {¶ 39} "(B) (1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:"
 {¶ 40} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 41} "(b) The child is abandoned.
 {¶ 42} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody. *Page 12 
 {¶ 43} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 44} As previously stated, the first requirement of the permanent custody statute requires the court to determine whether any of the four conditions present in R.C. 2151.414(B)(1)(a)-(d) have been established. In the instant matter, the father maintains the trial court erred in finding that M.T. cannot or should not placed with either parent.
 {¶ 45} To find that the child should not be placed with either parent, the court must find by clear and convincing evidence one or more of the factors enumerated in R.C. 2151.414(E). "The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time." In re Pettiford, Ross App. No. 06CA2883, 2006-Ohio-3647.
 {¶ 46} Here, the trial court found clear and convincing evidence of six of the factors enumerated in R.C. 2151.414(E).
 {¶ 47} First, the trial court determined that "the mother and father failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home." See R.C.2151.414(E)(1). The mother admitted that she had relapsed in her drug use and was incarcerated at the time of the hearing for two years. Accordingly, she clearly did not remedy the conditions for *Page 13 
M.T. Additionally, while the father attempted to remedy the conditions, his attempts were not substantial and minimal at best. He failed to visit with the child until he was six months old. The father maintains that he appeared at the visits only when paternity was established. However, the delay in establishing paternity was completely due to the father's repeated failure to submit to a tests offered by CCDCFS, such requests first being made at the child's birth. Moreover, the father repeatedly failed to submit to urine screens mandated by the court and requested by CCDCFS in the case plan.
 {¶ 48} Next, the trial court concluded and the mother stipulated that she had a severe substance abuse problem that made her unable to provide for M.T. at that time or any time in the near future. See R.C.2151.414(E)(2).
 {¶ 49} Moreover, the trial court determined that both parents "demonstrated a lack of commitment toward the child by failing to regularly support, visit or communicate with the child when able to do so, or by other actions, have shown an unwillingness to provide an adequate permanent home for the child." See R.C. 2151.414(E)(4). There is no dispute that the mother, who was incarcerated for two years at the time of the hearing could not support, visit or communicate with the child. Furthermore, in regards to the father, he failed to visit or communicate with the child for the first six months of his life and only made three visits with the child by the time M.T. was ten months old. *Page 14 
 {¶ 50} Also, the trial court determined that the mother and father abandoned the child. See R.C. 2151.414(E)(10).
 {¶ 51} Moreover, there is no dispute that both the mother and father had their parental rights involuntarily terminated pursuant to this section or R.C. 2151.353 or 2151.415 with respect to a sibling of the child. See R.C. 2151.414(E)(11). CCDCFS had previously been awarded permanent custody of D.T., the son of both the mother and father and older sibling to M.T. The father argues that this factor should not apply to him because his sister adopted D.T. as he desired. Adoption by a family member, however, does not change the fact that the father's parental rights were involuntarily terminated with regard to D.T.
 {¶ 52} Finally, the court determined and there is no dispute that the "[m]other was incarcerated at the time of the [dispositional hearing] and will not be available to care for the child for at least eighteen months after the filing of the complaint for permanent custody." See R.C. 2151.414(E)(12).
 {¶ 53} As six of the factors proffered in R.C. 2151.414(E) exist, we find competent, credible evidence existed to support the trial court's finding that M.T. cannot and should not be returned to either parent within a reasonable time.
 {¶ 54} Having affirmed the trial court's decision that M.T. cannot and should not be placed with either parent, we next consider whether competent and credible evidence existed establishing that permanent custody was in the best interest of the *Page 15 
child. In determining the best interest of the child, the trial court must consider the factors listed in R.C. 2151.414(D). These factors are as follows:
 {¶ 55} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 56} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard to the maturity of the child;
 {¶ 57} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two period ending on or after March 1, 1999.
 {¶ 58} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 59} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 60} In the case sub judice, the trial court had before it sufficient evidence to find, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to CCDCFS.
 {¶ 61} With respect to the first factor, the child's interrelationships and interactions, the evidence illustrates that the father did not visit with the child until *Page 16 
August 15, 2006, thereby missing nearly six months of his life. In all, the father only attended 14 of the scheduled 34 visits. When he did visit with the child, Eric Ploscik, the social worker, noted that the father seemed nervous and anxious and that most of the interaction was between the child and the father's girlfriend. Additionally, M.T. is doing well with his foster parents, who have been with the child since three days following his birth, have established a bond with the child, and who expressed their desire to adopt him. (Tr. 59.)
 {¶ 62} Regarding the second factor, the child's wishes, M.T. is too young to express his wishes with regard to placement. It is important to note, however, that the child's guardian ad litem opined that it is in the best interest of the child to grant permanent custody to CCDCFS.
 {¶ 63} With respect to the child's custodial history, M.T. had been in CCDCFS's custody and living with his foster parents since his birth, or for one year, two months and 19 days at the time of the dispositional hearing.
 {¶ 64} Fourth, regarding the child's need for a legally secure permanent placement and whether that placement can be achieved without granting permanent custody, the evidence shows that M.T. has been in foster care since birth and that his foster parents, with whom he has established a bond, wish to adopt him. (Tr. 59.) No other relative has expressed a desire to adopt.
 {¶ 65} Additionally, it is uncontested that the mother has a substance abuse problem and was, at the time of the hearing, incarcerated for two years. *Page 17 
Furthermore, while the father has made an effort to visit and communicate with the child in the last few months, he made little contact, if any, for the first nine months of the child's life. The father's argument that he refused to visit the child until paternity was established is unpersuasive given the fact that the delay in establishing paternity was due to the father's own refusal to submit to testing. Eric Ploscik testified that he informed the father at the birth of M.T. to perform a paternity test and the father refused until August of 2006. Additionally, concerns still emanate as a result of the father's failure to comply with court mandated and CCDCFS requested urine screen tests. Accordingly, the record supports a determination that a legally secure and permanent placement of M.T. cannot be achieved without a grant of permanent custody to CCDCFS.
 {¶ 66} With respect to the fifth factor, the trial court is directed to consider R.C. 2151.414(E)(7) to (E)(11). We previously determined that the mother and father had their parental rights permanently and involuntarily terminated with respect to a sibling of M.T. See R.C.2151.414(E)(11).
 {¶ 67} Having determined that evidence supports all five factors enumerated in R.C. 2151.414(D), we find competent, credible evidence existed supporting the trial court's finding that permanent custody was in the best interest of the child.
 {¶ 68} Finally, the father alluded to the argument that CCDCFS did not make a good faith effort towards reunification. We acknowledge that, upon the filing of a complaint seeking permanent custody, a trial court must make reasonable efforts to *Page 18 
reunify a family prior to terminating parental rights. See R.C.2151.419(A)(1); In re C.F., 113 Ohio St.3d 73, 79, 2007-Ohio-1104,862 N.E.2d 816. An agency, however, is relieved of the responsibility of making reasonable efforts when the parent had their parental rights involuntarily terminated with respect to a sibling of the child. R.C.2151.419(A)(2) provides that if any of the following factors apply, "the court shall make a determination that the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home:"
 {¶ 69} "* * *
 {¶ 70} "(e) The parent from whom the child was removed has had parental rights involuntarily terminated pursuant to section 2151.353,2151.414, or 2151.415 of the Revised Code with respect to a sibling of the child."
 {¶ 71} In the instant action, the evidence demonstrated that the father's and mother's parental rights were involuntarily terminated with respect to M.T.'s sibling. Thus, R.C. 2151.419(A)(2)(e) relieved CCDCFS of any duty to use reasonable efforts.
 {¶ 72} Based on the foregoing, we find the father's first assignment of error without merit.
 {¶ 73} The father's second assignment of error states: *Page 19 
 {¶ 74} "The trial court erred in not ordering the child placed in a planned parenting living arrangement, when an order was supported by the evidence adduced at trial and which evidence did satisfy the statutory requirements and conditions which allow a dispositional order of planned permanent living arrangement."
 {¶ 75} Within this assignment of error, the father argues the trial court erred in not placing M.T. in a planned parenting living arrangement ("PPLA"). A PPLA is a form of custody where the child is placed in a foster home or institution and remains there until the child is no longer in the child services system. In re M.E., Cuyahoga App. No. 86274, 2006-Ohio-1837. A PPLA provides the child with legally permanent placement but does not sever the parental bond. Id.
 {¶ 76} R.C. 2151.353(A)(5) provides that a court may "[p]lace the child in a planned permanent living arrangement with a public children services agency or private child placing agency, if a public children services agency or private child placing agency requests the court to place the child in a planned permanent living arrangement and if the court finds, by clear and convincing evidence, that a planned permanent living arrangement is in the best interest of the child and that one of the following exists:"
 {¶ 77} "(a) The child, because of physical, mental, or psychological problems or needs, is unable to function in a family-like setting and must remain in residential or institutional care. *Page 20 
 {¶ 78} "(b) The parents of the child have significant physical, mental, or psychological problems and are unable to care for the child because of those problems, adoption is not in the best interest of the child, as determined in accordance with division (D) of section 2151.414
[2151.41.4] of the Revised Code, and the child retains a significant and positive relationship with a parent or relative.
 {¶ 79} "(c) The child is sixteen years of age or older, has been counseled on the permanent placement options available to the child, is unwilling to accept or unable to adapt to a permanent placement, and is in an agency program preparing the child for independent living."
 {¶ 80} In In re A.B., 110 Ohio St.3d 220, 2006-Ohio-4359,852 N.E.2d 1187, the Supreme Court of Ohio interpreted this statute and held that juvenile courts lack the authority to place a child in a PPLA, unless the children services agency files a motion requesting such a disposition. Id. at 238. The court provided the following reasoning:
 {¶ 81} "In addition, if the juvenile court were able to place the children in a planned permanent living arrangement without a request from the CSB, then R.C. 2151.415(C)(1) would be meaningless. R.C.2151.415(C)(1) states that if an agency requests that the court place the child in a planned permanent living arrangement, the agency `shall present evidence to indicate why a planned permanent living arrangement is appropriate for the child, including, but not limited to, evidence that the agency has tried or considered all other possible dispositions *Page 21 
for the child.' This language indicates that a planned permanent living arrangement is to be considered as a last resort for the child, more evidence that the General Assembly's goal is to avoid allowing children to languish indefinitely in foster care."
 {¶ 82} Id. at 237.
 {¶ 83} In the instant action, CCDCFS only made a request for permanent custody and never requested a PPLA for M.T. Accordingly, the trial court was not authorized to place M.T. in a PPLA. Therefore, we find the trial court was correct in not ordering such a disposition. The father's final assignment of error is without merit.
 {¶ 84} Having determined that the mother's and father's appeals are without merit, we affirm the judgment of the trial court awarding permanent custody of M.T. to CCDCFS.
Judgment affirmed.
It is ordered that appellee recover from appellants costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 22 
FRANK D. CELEBREZZE, JR., J., CONCURS. SEAN C. GALLAGHER, P.J., CONCURS.
(SEE ATTACHED CONCURRING OPINION)
[1] This court protects the identity of all parties in juvenile court cases.